**ROTHE DEVELOPMENT CORP., Plaintiff,**

v.

**U.S. DEPARTMENT OF DEFENSE et al., Defendants.**

**No. CIV.A. SA–98–CA–1011–XR.**

United States District Court, W.D. Texas, San Antonio Division.

July 2, 2004.

David Franklin Barton, The Gardner Law Firm, San Antonio, TX, for Rothe Development Corporation, a Texas Corporation.

Britannia Hobbs, United States Attorney, Western District of Texas, San Antonio, Jay D. Adelstein, U.S. Department of Justice, Civil Rights Division, Marybeth Martin, U.S. Department of Justice, Employment Litigation Section, Andrew G. Braniff, U.S. Department of Justice, Civil Rights Division, Washington, DC, for United States Department of Defense, the United States Department of the Air Force.

## ORDER

RODRIGUEZ, District Judge.

On this day, the Court considered cross motions for summary judgment submitted on October 20, 2003. In addition, the Court considered responses, replies, and sur-replies submitted by both parties. While the parties did not agree as to the exact scope of inquiry presented to this Court by the Federal Circuit's remand, both provided ample documentation and legal arguments for consideration. The Government argues that the law of the case limits this action to whether Congress had a compelling interest in 1992 when it

reauthorized the National Defense Authorization Act of 1987 (the "Act"). This Court, however, expressly ordered Defendant to consider the Federal Circuit's entire remand and as such, issues this Order in accordance with that remand.

At issue is the constitutionality of Section 1207 of the National Defense Authorization Act of 1987 (the "Act"). In the Act, Congress set a goal that five percent of the total dollar amount of defense contracts for each fiscal year would be awarded to small businesses, owned and controlled by socially and economically disadvantaged individuals. 10 U.S.C. § 2323. In order to achieve that goal, Congress authorized the Department of Defense to adjust bids submitted by non-socially and economically disadvantaged firms upwards by ten percent (the "price evaluation adjustment program" or "PEA"). 10 U.S.C. § 2323(e)(3). Thus, as happened here, even though Plaintiff Rothe Development Corporation ("Rothe") was technically the lowest bidder on a defense contract, its bid was adjusted upward by ten percent, and a third party, who qualified as a socially and economically disadvantaged business, became the "lowest" bidder.

Rothe complains that both the five percent goal and the ten percent preferential increase violate the Equal Protection guarantee of the Fifth Amendment because both rely in part on race-conscious classifications. In order to uphold a remedial race-conscious program, the Government must show that the statute is narrowly tailored to meet a compelling governmental interest. The burden rests with the Government to demonstrate that Congress had a strong basis in evidence to create this remedial program. Here, the Government defended the 5% goal and the price evaluation program by articulating a com-

pelling interest in ensuring that public dollars do not finance private discrimination. Because the Government provided ample evidence demonstrating that the Department of Defense was acting as a passive participant in present day discrimination, this Court finds that Congress had a strong basis to believe that a race based remedy was necessary in 2003. However, the Government was not able to meet this standard as it applied to Rothe's bid in 1998. Thus, the Court GRANTS, in part, and DENIES, in part, Defendant's Motion for Summary Judgment and finds the 5% goal and the PEA program conducted pursuant to the National Defense Authorization Act of 1987, as reauthorized in 2003, constitutional on its face. The Court also GRANTS, in part, and DENIES, in part, Plaintiff's Motion for Summary Judgment, and finds the 5% goal and the PEA program as reauthorized in 1992 and applied in 1998, unconstitutional. (docket nos. 147 and 151).[1]

## Section I.   Background

### A.   The Program at Issue

This contract dispute arose in 1998 when Rothe submitted a "technically acceptable" lower bid on a government contract solicitation but was not awarded the contract due to the application of a ten percent preferential increase of its bid. Rothe, a Texas corporation owned by a white female, sought the contract for the computer operations and maintenance services for the Base Telecommunication System and Network Control Center at Columbus Air Force Base in Mississippi. Rothe had previously been awarded this contract and was the incumbent contractor at the time of this new solicitation by the Department of Defense. There is no dispute that Rothe adequately performed under the

---

1.   Defendant's Motion for Summary Judgment dated September 26, 2003, was superseded by the Motion for Summary Judgment dated October 20, 2003. Thus, that Motion is DENIED as moot (docket no. 144).

prior contract. Although Rothe's bid was numerically the lowest, a second company, International Computers & Telecommunications ("ICT"), was awarded the contract after Rothe's bid was increased by ten percent according to the PEA program. ICT was owned and operated by an Asian American, and the business qualified as a socially and economically disadvantaged small business.

On November 14, 1986, Congress enacted the National Defense Authorization Act of 1987. Pub.L. 99–661, 100 Stat. 3816. "Congress may employ racial or ethnic classifications in exercising its Spending or other legislative powers only if those classifications do not violate the equal protection component of the Due Process Clause of the Fifth Amendment." *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In Section 1207 of the Act, Congress established an annual goal that five percent of the total dollar amount spent for defense contracts should be awarded to small businesses owned and controlled by socially and economically disadvantaged individuals. In order to meet this goal, the Department of Defense uses several methods, including the program at issue here. The Act specifically defined the term "socially and economically disadvantaged" in accordance with the Small Business Act and the regulations issued pursuant to it. 15 U.S.C. § 631 *et seq.* "[S]ocially disadvantaged individuals are those who have been subject to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "[E]conomically disadvantaged individuals are those socially disad-

vantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). There is a presumption that Black Americans, Hispanic Americans, Native Americans, and Asian–Pacific Americans are socially and economically disadvantaged individuals. 15 U.S.C. § 637(d)(3)(C).[2] This presumption may be rebutted with credible evidence by a contracting officer, a failed bidder, or the Small Business Administration. 13 C.F.R. § 124.1017. In addition, any business concern or individual has the right to apply to be considered socially and economically disadvantaged. 13 C.F.R. § 124.201.

In order to help meet the goal of five percent participation, all competitive bids sought by the Department of Defense were subject to a ten percent preferential increase when competing with small businesses owned and controlled by socially and economically disadvantaged individuals (known as small disadvantaged businesses or "SDB's"). 10 U.S.C. § 2323(e)(3) reads in full:

To the extent practicable and when necessary to facilitate achievement of the 5 percent goal described in subsection (a), the head of an agency may enter into contracts using less than full and open competitive procedures (including awards under section 8(a) of the Small Business Act) and partial set asides for entities described in subsection (a)(1), but shall pay a price not exceeding fair market cost by more than 10 percent in payment per contract to contractors or

2. In its regulations, the Small Business Administration has added Subcontinent Asian Americans into the list of groups presumed to be socially disadvantaged. 13 C.F.R. § 124.103(b). The Small Business Act lists

the above four groups but states that the presumption should apply to "other minorities, or any other individual found to be disadvantaged by the Administration ...." 15 U.S.C. § 637(d)(3)(C).

subcontractors described in subsection (a). The head of an agency shall adjust the percentage specified in the preceding sentence for any industry category if available information clearly indicates that nondisadvantaged small business concerns in such industry category are generally being denied a reasonable opportunity to compete for contracts because of the use of that percentage in the application of this paragraph.

Here, Rothe contends that the PEA program unconstitutionally takes race into consideration, thus violating the Equal Protection guarantee of the Fifth Amendment.[3] Although race is not the only consideration in determining whether a business will qualify as an SDB, Black Americans, Hispanic Americans, Asian–Pacific Americans, and other minorities are presumed to be both economically and socially disadvantaged. 15 U.S.C. § 637(d)(3)(C); 10 U.S.C. § 2323(a)(1)(A). Thus, even though the program benefits "socially and economically disadvantaged" businesses and individuals, the term is not race neutral because of the underlying rebuttable presumption. *See also Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir.2003) (holding that although the program confers benefits on "socially and economically disadvantaged" individuals, a term which is race-neutral, strict scrutiny applies because the statute presumes minorities are in that class).

Rothe complains of the 5% goal and the PEA program on its face and as applied to Rothe's 1998 bid. Rothe has not brought a generalized challenge to the Small Business Act of 1958.[4] The Small Business Act promotes a governmental policy of maximizing small business opportunities. 15 U.S.C. § 631. This policy choice by Congress is not at issue today. Instead, the issue presented is the constitutionality of the 5% goal and the preferential price increase that uses the race neutral term, "socially and economically disadvantaged individuals."

### B. Procedural Background

Rothe originally filed this action in November 1998. At that time, the program had last been reauthorized in 1992. In its complaint, Rothe asked the Court to: (1) grant judgment declaring 10 U.S.C. § 2323 unconstitutional; (2) enjoin Defendants from discriminating on the basis of race or national origin in the administration of federal government contracting; (3) issue an injunction preventing any work on the 1998 contract; (4) direct Defendants to award Rothe the 1998 contract; (5) award Rothe its costs of bid preparation and presentation for the 1998 contract under the Tucker Act; and (6) award Rothe its court costs, reasonable attorney's fees and expenses. In April 1999, the Honorable Judge Edward C. Prado[5] granted summary judgment in fa-

---

**3.** "Pub.L. No. 99–661, § 1207(a), 10 U.S.C. § 2323, as amended, requires the use of racial preferences in the award of federal contracts, without any findings of past discrimination in the award of such contracts." (Plaintiff's First Amended Complaint, ¶ 59).

**4.** The Court does not reach the issue of whether Rothe has standing to bring such a challenge. *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1160 (10th Cir.2000) (*"Adarand VII"*). The Court disagrees with Rothe's contention that "[a]lthough Rothe did

not seek relief of a declaration that the [SBA] 8(a) and 8(d) programs are unconstitutional, they must necessarily fall along with § 1207 and the Court should so state." (Plaintiff's Sur–Reply in Response to Defendant's Motion for Summary Judgment, n. 9).

**5.** Honorable Judge Prado was nominated by President George W. Bush on February 6, 2003, to a seat on the United States Court of Appeals for the Fifth Circuit. Confirmed by the Senate on May 1, 2003, Judge Prado received his commission on May 5, 2003.

vor of Defendants, in part, because the government produced sufficient evidence that the remedial measure was constitutional. Once the government met this burden, the challenging party bore the ultimate burden of demonstrating the racial classification unconstitutional. Judge Prado held that Rothe failed to meet that burden. *Rothe Dev. Corp. v. U.S. Dep't of Defense*, 49 F.Supp.2d 937 (W.D.Tex.1999) (*"Rothe I"*).

Rothe appealed Judge Prado's grant of summary judgment to the Fifth Circuit. The Government moved to dismiss for lack of subject matter jurisdiction because the Federal Circuit has exclusive jurisdiction over all cases that include a Tucker Act claim. 28 U.S.C. § 1295(a)(2). The Fifth Circuit agreed but rather than dismissing the appeal, transferred the case to the United States Court of Appeals, Federal Circuit. *Rothe Dev. Corp. v. U.S. Dep't of Defense*, 194 F.3d 622 (5th Cir.1999) (*"Rothe II"*). The Federal Circuit held that "the district court failed to analyze the constitutionality of the 1207 program under the strict scrutiny analysis required by the Supreme Court in *Croson* and *Adarand*, and relied on post-reauthorization evidence to determine the constitutionality of the 1207 program as reauthorized . . . ." *Rothe Dev. Corp. v. U.S. Dep't of Defense*, 262 F.3d 1306, 1332 (Fed.Cir.2001) (*"Rothe III"*). Because the Federal Circuit found that the district court improperly applied a deferential standard when reviewing this equal protection challenge, it effectively gave a road map to be followed on remand. The road map though, quickly became obsolete.

Once remanded to the District Court, Defendants filed a Motion to Dismiss Plaintiff's Claims for Mootness. This Motion was granted in part. The Fifth Circuit, on Rothe's original appeal, granted a stay prohibiting Defendants from awarding the 1998 contract. When the case was transferred to the Federal Circuit, the Federal Circuit extended the stay. But despite numerous objections by Rothe, the Federal Circuit did not prevent Defendants from soliciting and awarding a replacement contract without the price evaluation program. Because the 1998 contract was stayed, the Department of Defense resolicitated bids and awarded the new contract without the PEA program to an entirely different entity than the ones at issue in this suit. As Rothe could no longer argue for an injunction as to that contract or be awarded that contract, those two claims were moot. In addition, Defendants tendered a payment of $10,000 to Rothe under the Tucker Act as payment for costs incurred in the original bid preparation and presentation which rendered that claim moot. The only remaining substantive claim seeks prospective injunctive and declaratory relief.[6] Thus, Rothe's only remaining remedy for its as-applied challenge concerning the 1998 contract disposition is declaratory relief. However, Rothe's facial challenge to the program seeks prospective declaratory and injunctive relief. Because Rothe can no longer seek injunctive relief as to its bid in 1998, but still seeks prospective injunctive and declaratory relief, the Court must address both the 1992 reauthorization as well as the 2003 reauthorization.

## C. The Directive from *Rothe III*

"The constitutionality of the 1207 program must be assessed as reauthorized in 1992, as applied to Rothe's bid in 1998, and at present, to the extent that declaratory or injunctive relief is still sought." *Rothe III*, 262 F.3d at 1329.

### 1. Burden of Proof

The Federal Circuit has reiterated the burden of proof in the case for the as-

---

6. *Rothe* also seeks court costs, reasonable attorney's fees and expenses.

applied challenge.[7]

Before a court can assess whether a plaintiff has met his or her burden of proof, however, the court must review the government's evidentiary support to determine whether the legislative body had a "strong basis in evidence" to believe that remedial action based on race was necessary. Thus, the government bears the burden to produce evidence, *i.e.,* the burden of going forward with evidence. The challengers, however, "continue to bear the ultimate burden of persuading the court that the [entity's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently narrowly tailored."

*Rothe III,* 262 F.3d at 1317 (citations omitted). Thus, in Rothe's as-applied challenge, the Government bears the burden to demonstrate that the Department of Defense was a passive participant in discrimination, or was attempting to correct the lingering effects of past discrimination. Once the Government demonstrates a compelling interest, supported by a strong basis in the evidence, Rothe must produce "credible, particularized evidence to rebut the government's initial showing of the existence of a compelling interest" or show that the remedial program created is not narrowly tailored. *Id.; Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147, 1175 (10th Cir.2000) (*"Adarand VII "*).

### 2. Compelling Interest

"[T]he 1207 program cannot be constitutional unless it was indeed enacted as a remedial measure." *Id.* "It is beyond dispute that any public entity, state or federal, ha[s] a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evils of private prejudice." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 492, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Sherbrooke,* 345 F.3d at 969; *Contractors Assoc. of E. Pa., Inc. v. The City of Philidelphia,* 6 F.3d 990, 1002 (3d Cir.1993); *Assoc. Gen. Contractors of Ca., Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1413 (9th Cir.1991). However, the Government must first demonstrate that Congress had a "strong basis in the evidence" supporting its conclusion that the program at issue was necessary to further that compelling interest. *Croson,* 488 U.S. at 500, 109 S.Ct. 706; *Sherbrooke,* 345 F.3d at 969.

Under *Croson,* the Court must "define both the scope of the injury and the extent of the remedy necessary to cure its effects" when determining the motive behind enacting such a remedial program. *Croson,* 488 U.S. at 510, 109 S.Ct. 706. This is to ensure that the motive behind the program is legitimate and "not merely the product of 'illegitimate racial prejudice or stereotype' or enacted in response to nonracial factors hindering minority participation" such as a lack of access to capital. *Rothe III,* 262 F.3d at 1329. If the Court finds the program remedial, it must then specify whether the remedy combats present discrimination or counters the lingering effects of past discrimination. *Id.* If it is a lingering effects case, the Court would be compelled to assess whether the evidence of discrimination is still probative. *Id.* Either way, however, the Court should specify whether the Government's involvement in the discrimination was so pervasive that it actually became a "passive participant" in perpetuating it. *Id.*

---

**7.** This Court addresses the burden of proof under a facial challenge in Section II(D) of this order.

The Federal Circuit also emphasized that this Court must consider the above determination in light of the fact that Congress has a "broader brush" than all other bodies of government for remedying discrimination. *Id. citing Rothe I,* 49 F.Supp.2d at 944.

> Here we deal ... not with the limited remedial powers of a federal court, for example, but with the broad remedial powers of Congress. It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees.

*Fullilove,* 448 U.S. at 483, 100 S.Ct. 2758. Because "[t]he degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of the governmental body," this Court must determine how much evidence is necessary in order for Congress to use this power and create a nationwide program. *Fullilove,* 448 U.S. at 515–16 n. 14, 100 S.Ct. 2758 (Powell, J. concurring).

When the Court reviews the evidence of discrimination before Congress, it first must look to evidence of discrimination against Asian–Pacific Americans. *Rothe III,* 262 F.3d 1306. Rothe urges this Court to examine specifically Korean–Americans because ICT was owned by a member of that particular ethnic group. The law, however, rejects such specificity. *Id.* at 1330; *See also Adarand VII,* 228 F.3d at 1147. Second, in addition to reviewing evidence of discrimination against a particular minority group, the Court must also specify the discriminatory conduct or effects in the specific industry. While Rothe contends that the industry grouping should be limited to computer maintenance and repair services in the defense industry, the Government argues that the industry should be broadly classified as "business services." Again, Rothe's contention narrows the inquiry too much for Congress. Congress' "broad brush" cannot be expected to subclass each and every industry. Rather, Congress need only look to broad categories to provide information on the prevalence of discrimination. Third, and finally, the Court should determine if the "evidence before it is sufficiently timely and sufficiently substantive (i.e., not merely anecdotal) to properly support the program's constitutionality." *Id.*

### 3. Narrow Tailoring

There are six factors commonly considered in the narrowly tailored test. They are (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver provisions; (4) the relationship of the stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the overinclusiveness or underinclusiveness of the racial classification. *Id.* at 1331 *citing U.S. v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *Croson,* 488 U.S. at 506, 109 S.Ct. 706; *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) *("Adarand III ").* Because the Federal Circuit held that the Court "correctly concluded that the 1207 program was flexible in application, limited in duration, and that it did not unduly impact the rights of third parties," this Court will only consider the remaining three factors if necessary. Those factors are (1) the efficacy of race neutral alternatives; (2) the evidence detailing the relationship between the stated numerical goal of five percent and the relevant market; and (3) the over- and under-inclusiveness of the program.

## Section II.  Analysis

### A.  Standard of Review and Jurisdiction

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party has the burden of showing that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law. *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir.1995). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir.1991).  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  In making this determination, the court should review all the evidence in the record and disregard the evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 4, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  If the record, viewed in this light, could not lead a rational trier of fact to find for the party opposing the motion, summary judgment is proper.

Because a court's power only extends to live cases and controversies, a court must not decide the merits of a moot case.  In general, a matter is moot if the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.  *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).  Because Plaintiff requested injunctive and declaratory relief, it provided for a live and articulated controversy between these two parties.  *Id.* at 499, 89 S.Ct. 1944.  In addition, a case does not become moot simply because the challenged conduct has temporarily ceased.  *NLRB v. Raytheon Co.*, 398 U.S. 25, 27–28, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970). Here, the Act contains a provision for its suspension when the Department of Defense meets its five percent goal.  Thus, the preferential price increase has not actively been used since 1998.  However, the possibility that the program could be reimplemented in the future confirms that the issue presented remains a live controversy. Because Rothe satisfied its burden in establishing that it actively bids for Department of Defense contracts, there is also a reasonable expectation that it could be subject to the same alleged unconstitutional conduct.  Thus, the Court is satisfied that it retains jurisdiction over this matter.

### B.  Strict Scrutiny and Scope of Permissible Evidence

Strict scrutiny must " 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool" and to "ensure[ ] that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. 706. "The institution that makes the racial distinction must have had a 'strong basis in

evidence' to conclude that remedial action was necessary *before* it embarks on an affirmative action program." *Shaw v. Hunt,* 517 U.S. 899, 910, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (emphasis in original) *citing Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The Federal Circuit instructed this Court to "draw the line" in the first instance when finding enough evidence to support a national remedial program. *Rothe III,* 262 F.3d at 1330.

In *Rothe I* and *Rothe III,* the Courts were most interested in the 1992 reauthorization since that law applied to Rothe's contract bid in 1998. Since 1998, Congress has once again reauthorized the program, most recently in 2003, and Rothe's claims as to its 1998 bid are moot. While the Government urges this Court to limit its review to the 1992 reauthorization, Rothe urges the Court to look at the entire program as enacted today. Both parties are partially correct. Because Rothe brings an as-applied challenge to the law in connection with the 1998 bid it lost, the Court must look at the 1992 reauthorization and apply the law as it stood in 1998. The only remaining remedy for Rothe, concerning its 1998 bid, is declaratory. Because Rothe also brings a facial challenge and seeks prospective injunctive and declaratory relief, the Court must examine the law, and the evidence used to support the law, as it stands today because of the 2003 reauthorization.

While the standard of review—strict scrutiny—for these two claims will not differ, the evidence the Court reviews does change. In the as-applied challenge, Congress must have had a strong basis in the evidence before enacting the program. *Shaw,* 517 U.S. at 910, 116 S.Ct. 1894. For this challenge, the Government must rely on evidence Congress had before it in 1992 to demonstrate that a race-based remedial program was necessary. However,

in the facial challenge, where Rothe seeks prospective injunctive and declaratory relief, the Court can examine evidence available to Congress prior to the 2003 reauthorization because an enactment and a reauthorization are equivalent. *See Rothe III,* 262 F.3d at 1327–28. In the facial challenge, the initial burden remains with the Government to demonstrate a compelling interest. However, the burden shifts to Rothe to demonstrate that under no set of circumstances could the law be constitutionally applied. *U.S. v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus, in a facial challenge, evidence documented by Congress prior to 2003 will be particularly crucial in determining whether injunctive relief should be issued. *Rothe III,* 262 F.3d at 1325–27; *see also Engin'g Contractors Assoc. of S. Fla., Inc. v. Metropolitan Dade County,* 122 F.3d 895, 911 (11th Cir.1997).

### C. As Applied Challenge in 1998

■ "[R]ace unfortunately still matters." *Grutter v. Bollinger,* 539 U.S. 306, 333, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand III,* 515 U.S. at 237, 115 S.Ct. 2097. Although this particular contract concerns the Department of Defense, the general issue is public contracting. *See Rothe III,* 262 F.3d at 1327, n. 19. For Rothe's as-applied challenge, it seeks a declaration that the program, as applied to it in 1998, is unconstitutional. Therefore, the Court must look at the evidence Congress compiled *before* 1992, when it had reauthorized the program that was in effect in 1998, when determining that racial discrimination existed in public contracting. *Shaw,* 517 U.S. at 910, 116 S.Ct. 1894.

The Government failed to demonstrate that Congress had a strong basis to believe that a race-based remedial program was necessary in 1992. As the Federal Circuit points out, "[s]tatistical evidence is particularly important to justify race-based legislation." *Rothe III*, 262 F.3d at 1323. The Government provides limited statistical evidence from this time period but relies instead on completely valid and persuasive anecdotal evidence and evidence of private discrimination. Unfortunately, Congress could not have been aware that it had a burden to statistically document the need for a race based program until 1995 when the Supreme Court issued *Adarand III* in 1995 or *Shaw* in 1996. While the Court finds it troubling to apply a standard for evidence not announced until 1995 to a Congress acting in 1992, *Shaw* and *Rothe III*, make it clear that the Court must do so. Because the Government cannot offer any substantial statistical evidence that the Department of Defense discriminated against minority small businesses, particularly Asian–American small businesses, in this particular industry, it fails to meet its initial burden.

By discussing the evidence, the Court demonstrates that this evidence is insufficient to sustain an affirmative action program in public contracting without the statistical evidence that the Government proffers in support of the program as reauthorized in 2003. The following evidence from 1992 sets the stage for what Congress was aware of throughout the years. The support the Government offers demonstrates Congress' ongoing concern and study of affirmative action programs in America. For example, Congress was well aware that unions overtly discriminated against minority members and that despite numerous court cases, this private discrimination prevented minorities from learning certain trades. *See U.S. v. Ironworkers, Local 86*, 443 F.2d 544 (9th Cir.1971);

*Local 53 of the Intern'l Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler*, 407 F.2d 1047 (5th Cir.1969). While the Supreme Court expressed doubt whether Congress can extrapolate findings of private discrimination to support a finding of unconstitutional discrimination in the public sector, this Court finds that this evidence is conclusive. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 90, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Congress must be able to rely on cases where federal agencies have found private discrimination pervasive in the skills needed to compete for public contracts. It is exactly this type of information that most likely would come to Congress' attention, and this type of evidence that would support a congressional finding that the government acts as a passive participant in discrimination. If Congress cannot reach to the source of the discrimination to cure this evil, then Congress' hands would unnecessarily be tied.

Beginning in 1984, Congress sought to encourage socially and economically disadvantaged firms to participate in public contracting. In a House Committee on Appropriations report, the Committee expressed concern "that the level of socially and economically disadvantaged business participation in Defense procurements does not adequately reflect the Department's best efforts toward expanding opportunities for such businesses." H.R. Rep. 1086, 98th Cong.2d Sess., at 100–01 (1984). The Committee went on to suggest that a 10 percent procurement share was a reasonable goal. *Id.* A year later, this same Committee instead suggested a five percent goal. This change in percentages implies that the Committee examined the available SDB's, looked to the SBA's program of compliance, and created what it thought was a realistic goal. *See also*

H.R.Rep. No. 1086, 98th Cong., 2d Sess. 100–101 (1984) (low level of participation by disadvantaged firms in Defense Department contracting indicated a need to expand procurement opportunities at that agency for such firms). In addition, the program was made available to any concern who could qualify as a SDB. 13 C.F.R. § 124.201. Although race creates a rebuttable presumption that a business will qualify for the program, the program's articulated goal of encouraging small business participation in public contracting is also reached.

The Federal Circuit stated that "generalized assertions of legislative purpose or statement[s] alleging societal discrimination" have little or no probative value. *Rothe III*, 262 F.3d at 1323. This is true for the initial inquiry of whether Congress documented the need for a race-based remedial program when it first implemented this program because unsupported anecdotal evidence is not enough to sustain a race-based remedial program. *Concrete Works of Colo., Inc. v. City and County of Denver*, 36 F.3d 1513, 1520 (10th Cir.1994). The Court concludes that such statements would not be enough to demonstrate a strong basis in the evidence. However, these "generalized assertions" must be considered when determining Congress's intent. The Court can think of no better way in determining the actual purpose of Congress than by listening to what Congress said during committee meetings, legislative meetings, and floor debates. These generalized statements demonstrate what the body of Congress intended by reauthorizing and maintaining this program.

Rothe argues this type of evidence should be rejected considering the "partisan political nature of members of Congress." But a court rejecting congressional debate, intent, and enactments because they may have origins in political partisanship would be tantamount to engaging in judicial activism, disregarding the legislative branch. Indeed, while urging the Court to disregard some Congressional Members' testimony, Rothe quotes Representative Ireland from the *Acquisition Issues: Hearings Before the Investigations Subcommittee of the House Armed Services Committee*, 101st Cong., 2nd Sess. (1990), in support of its contention that Congress did not have valid statistical evidence to create the program in 1992.[8] Because the Court believes that "[p]eriodic legislative debate 'assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself,'" the Court finds statements made by Congress to be determinative. *Croson*, 488 U.S. at 510, 109 S.Ct. 706; *Sherbrooke*, 345 F.3d at 972. Plus, "anecdotal evidence may bring cold numbers convincingly to life." *Concrete Works*, 36 F.3d at 1521 *citing Intern'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Thus, it is precisely because Congress is political in nature that this type of evidence is relevant in determining whether Congress understood the problem various Americans faced when attempting to participate in public contracting opportunities.

In a hearing before the Committee on Small Business in the House of Representatives, June 12, 1991, Joshua Smith,

---

8. While Rothe objects that all evidence proffered by the Government prior to 1990 is stale, the Court finds that Congress cannot be expected to work in a vacuum. This program was initially enacted in 1987. Congress must have some sense of an institutional memory and as the program was reauthorized and amended, it is only fair to assume that Congress relied in part on evidence previously developed.

Chairman of the U.S. Commission on Minority Business Development placed the problem of present day discrimination at the center of his testimony.

> But Mr. Chairman, there is a problem that I have saved for last that I feel is absolutely critical to the future of minorities in business. That is there is a tremendously negative perception of minorities in business. It is whether one calls it racial, whether one calls it discriminatory, and you hear all kinds of labels. The truth of the matter is, we believe, and I believe, Mr. Chairman, that most people in their heart of hearts, do not believe that minorities can be successful in business.

*Hearing before Committee on Small Business, House of Representatives,* 102nd Cong. 102–25, 8–9 (1991). The Chairman responded some time later in the hearing by stating;

> So, I think we have to understand the fact that there are different types of discrimination. Some are more deeply ingrained and some are more easily overcome than others. So it's tough to speak in general terms of all past forms of discrimination and *present ones too.*

*Id.* at 22 (emphasis added). As the discussion wore on about the goals for the 8(a) program of the Small Business Act, it became obvious that the country was still striving to overcome past discrimination but also that SDB's were still being discriminated against by their own government.

Beyond the private sector, Congress heard evidence that the Department of Defense discriminated in the public sector. For example, a month later, Congress heard direct testimony from a former member of the House of Representatives that "the Department of Defense in the long years that I was in Congress, and

since then, was and has been hostile to minority businesses." *Hearing before Committee on Armed Services, House of Representatives,* 102nd Cong., 1st Sess., 20 (1991) (statement by Mr. Parren Mitchell), *reprinted in* 92 CIS H 20122. *See also* 131 Cong. Rec. 17,447 (1985) (statement by Rep. Conyers) (affirmative action needed to break down "buddy-buddy contracting" at the Defense Department, "which has the largest procurement program in the Federal Government"); *id.* (statement of Rep. Schroeder) (an "old boy's club" in Defense Department contracting excludes many minorities from business opportunities). These types of statements informed Congress and demonstrate the belief Congress held when creating the program at issue. Congress must act with purpose and this purpose is best demonstrated by what individual members of Congress report.

It is also important to note that these programs were being developed during the height of a defense procurement scandal which affected the entire nation. During the 1980's, a Justice Department investigation into the Pentagon, code named Operation Ill Wind, resulted in over 60 convictions for bribery and influence peddling.[9] References to this scandal can be found throughout committee meetings and congressional hearings because of its impact on defense contracts generally but specifically upon SDB's. Thus, while the Federal Circuit urged this Court to focus on statistical evidence, it is imperative to examine statistics in light of Congress' obvious concern that discrimination was not just lingering, but rather, scandalously being perpetrated by the Department of Defense.

The President understood that SDB's were not participating adequately at a national level. A year after the above

---

9. Renae Merle, *Recruiting Uncle Sam,* Washington Post, Feb. 19, 2004, at E01.

hearing, in *The State of Small Business: A Report of the President*, President George H.W. Bush stated that the nation needed to continue attempting to *diversify* small businesses through Federal procurement programs. *The State of Small Business: A Report of the President*, IX (1992) (emphasis added). The nation needed to continue diversifying small business participation through Federal procurement programs because minority and women owned firms were not participating at a national level. While the President did not speak to the reason behind this lack of participation, Congress held hearings to reauthorize these programs and to meet the President's objective.

At the Small Disadvantaged Business Reauthorization Hearing before the 102nd Congress, the Committee recognized that progress in diversifying public contracting had been slow. *See Small Disadvantaged Business Reauthorization Hearing*, 102nd Cong. 24 (1992). In 1988, the percentage of subcontracting awards to small disadvantaged businesses was 1.9 percent. *Id.* In 1989, it rose to 2.3 percent, then to 2.9 percent in 1990. *Id.* By 1992, SDB captured 3.6 percent of the subcontracting awards, but the Committee reauthorized the goal of 5 percent based on these dismal numbers. *Id.* Although unclear from that report, by comparing these numbers to an older Census report, it becomes apparent that minority firms were unable to participate at a national procurement level. For instance, the Census Bureau in 1987 stated that although minorities made up 20 percent of the population, minority firms made up only 8.9 percent of all firms and were only receiving 3.9 percent of all sales

and receipts. By 1997, minority firms made up 14.6 percent of all firms but were now only receiving 3.2 percent of all sales and receipts.[10] The Court does not "rest upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation" in the population. *Croson*, 488 U.S. at 507, 109 S.Ct. 706. These numbers illustrate that SDB's represented a significant portion of America's small businesses, but were unable to compete or receive a significant proportion of the federal dollars available. Thus, the small increase the Department of Defense saw in participation for small disadvantaged firms during the early 1990's did not match their participation and development at the national levels. As the Senate Committee stated in 1987 when it heard evidence on the Minority Business Development Program Reform Act of 1987, these statistical variations could not be the result of mere random chance. H.R.Rep. No. 460, 100th Cong. 18 (1987).

Although Congress is not entitled to deference when enacting race-based relief, the validity of the evidence is entitled to deference. *See Rothe III*, 262 F.3d at 1322, n. 4; Derek M. Alphran, *Proving Discrimination After Croson and Adarand: "If It Walks Like a Duck"*, 37 U.S.F.L. Rev. 887, 950 (2003). Even with some deference, the evidence above does not demonstrate a strong basis for Congress to believe that a race based remedial program was necessary because of the lack of statistical evidence of discrimination against Asian Americans in this particular industry. Because the Court holds that the Government did not meet its burden in demonstrating that the program was nec-

**10.** The 1997 census report warns however, that the data is not comparable because of significant methodology changes. Because the Court uses the data primarily to demonstrate that the percentage of minority firms

were receiving less than an equal share of national receipts, this change is insignificant. Minority Owned Business Enterprises, U.S. Census Bureau, at 9.

essary to further a compelling interest, the Court next turns to the remedies available to Rothe. Because most of Rothe's claims concerning it's 1998 contract are moot, Rothe can only seek a declaration that the 1207 program, as applied to it in 1998, was unconstitutional. Therefore, the Court holds that the program, as reauthorized in 1992 and applied in 1998, was unconstitutional and GRANTS Rothe's Motion for Summary Judgment in part.

Because the Government failed to meet its burden, the burden does not shift to Rothe in this aspect of Rothe's challenge. Rothe seems to argue that if the program fails in 1998, it must also fail in 2003. The Court now turns to Rothe's facial challenge of the 2003 program.[11]

### D. Facial Challenge

Because Rothe challenges the program facially, the Court must examine whether the program could be applied under any set of factual circumstances. *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). "A facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. 2095; *see also Barnes v. Moore*, 970 F.2d 12, 14 (5th Cir.1992). Although this dicta has been criticized in subsequent opinions, it has not been disavowed. *See City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *Janklow v. Planned Parenthood Sioux Falls Clinic*, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (mem). Thus, a facial challenge would place the burden on the challenger to show that the statute in question violates the law. *See Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("To prevail in such a facial challenge, respondents 'must establish that no set of circumstances exists under which the regulation would be valid.'"). This placement of the burden is true for both constitutional challenges and statutory challenges. *Id.*; Alfred Hill, *Some Realism about Facial Invalidation of Statutes*, 30 Hofstra L. Rev. 647, 651–52 (2002).

Here, however, the burden first rests with the Government to demonstrate that Congress had a strong basis in the evidence to create this remedial measure. *Rothe III*, 262 F.3d at 1317. However, the challenger bears the burden of proving the absence of a compelling interest, *or* "that the plan instituted on the basis of this evidence was not sufficiently narrowly tailored." *Id.* As is true in the as-applied challenge to an affirmative action program, the challenger bears the ultimate burden in a facial challenge. *Cf.* Richard H. Fallon, Jr., *As–Applied and Facial Challenges and Third Party Standing*, 113 Harv. L. Rev. 1321, 1336–37 (2000). Once the Government demonstrates that it had a compelling interest to enact this remedial measure, the burden shifts. The challenger must demonstrate that the statute, on its face, does not meet that compelling interest in any factual setting or that it is not narrowly tailored. Rothe cannot rely upon a worst case scenario to succeed with a facial challenge. *Oh. v. Akron Center for Reproductive Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ("The Court of Appeals should not have invalidated the Ohio statute on a facial challenge based upon a worst case analysis that may never occur."). "[T]he fact that [a legislative] Act might operate unconstitutionally under some conceivable set of

---

11. Because the program as reauthorized in 2003 has never been applied to Rothe, Rothe cannot bring an as-applied challenge.

circumstances is insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. *But see* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 STAN. L. REV. 235, 237 (1994) (arguing that the *Salerno* dicta does not accurately reflect the Supreme Court's practice in deciding facial challenges). Thus, showing that the statute is not narrowly tailored as to one minority group, such as Asian–Americans, cannot invalidate the entire program. If the program at issue can be constitutionally applied in just one set of circumstances, Plaintiff's facial challenge must fail. *City of Chicago*, 527 U.S. at 81, 119 S.Ct. 1849 (Scalia, J., dissenting).

Rothe contends that Congress must make findings of discrimination in each specific industry category and for each specific racial group. Because Congress did not make those findings in 1987, or again in 1992, Rothe argues that it is impossible to determine if the statute is remedial in nature. *Id.* However, as the Federal Circuit noted, Congress has a much "broader brush" when determining whether or not the federal government acts in a discriminatory way and the remedies it must implement to eliminate that discrimination. *Rothe III*, 262 F.3d at 1329. As discussed below, Congress was aware not only that the Department of Defense was a passive participant in perpetuating discrimination in public contracting, but that private discrimination was still rampant throughout the country. Congress did not believe the problem was perceived merely by a few, but heard evidence from citizens of multiple states explain that discriminatory conduct limited access of their small businesses to high dollar government contracts. Further, socially and economically disadvantaged small businesses were unable to compete effectively because of this handicap. Thus, "[i]f Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every state or locale in the Nation." *Sherbrooke*, 345 F.3d at 970.

Here, Congress' intent was to encourage participation in Department of Defense contracts by providing contracting advantages in a form consistent with the Small Business Act. Likewise, the PEA program is an example of a congressional plan to ensure that "federal funds [are not] distributed in a manner which reinforce[s] prior patterns of discrimination." *Croson*, 488 U.S. 469, 504, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *see also* Department of Defense: Federal Programs to Promote Minority Business Development: Hearing Before the Subcomm. on Minority Enterprise, Finance and Urban Development of the House Comm. on Small Business, 103d Cong., 1st Sess. 49 (1993) (statement of Rep. Roybal–Allard) ("Old attitudes and old habits die hard * * *. Defense contracting has, traditionally, been a closed shop. Only a select few need apply. Since the passage of the minority contracting opportunity law, some progress has been made."). These contracting advantages are similar to those found in the federal highway statutes requiring ten percent of federal highway construction funds to be paid to SDB's. *See Sherbrooke*, 345 F.3d 964. This Court, like the Tenth Circuit, finds that "Congress has spent decades compiling evidence of race discrimination in government highway contracting [public contracting], of barriers to the formation of minority-owned businesses, and of barriers to entry [by SDB's]." *Sherbrooke*, 345 F.3d at 970. Because the issue in this case is one of public contracting, the Court finds that much of the evidence that was sufficient for the Tenth Circuit, also satisfies this Court's inquiry. *See also Adarand VII*, 228 F.3d 1147 (holding that

a similar ten percent preferential increase in a public contract under the federal highway program met strict scrutiny when considering post-enactment evidence).

The Court finds that Congress believed, and stated in the record, that census numbers showing that socially and economically disadvantaged small businesses did not participate at a national level consistent with expectations must be attributed to more than random chance. It must be contributed to discrimination perpetuated both by the federal government, particularly the Department of Defense, and privately. Once this evidence is supplemented by the statistical evidence to be discussed, the Government meets its burden in demonstrating that a remedial program was necessary. Congress' statements are not based on individual beliefs but rather on what the committee documented from citizens across the nation when reauthorizing and discussing these types of programs for public contracting. By supplementing these statements with statistical studies produced by the Department of Commerce and the Department of Justice, the Government has met its burden. Further, the Court finds that Congress does not work in a vacuum. Numbers and statistics from 1990, 1996, and 1998, are still relevant to Congress' decision making in 2003. Rothe points to nothing in the congressional record or case law that demonstrates that evidence from these dates should be considered stale or invalid. While Rothe continuously argued that these figures are stale and of no use, the Court finds that it is precisely this information that Congress has relied upon. When a Supreme Court opinion, like *Adarand,* develops a new burden for Congress, Congress must be allowed ample time to remedy any error made in the legislative process. The Court has already concluded that in 1992, Congress did not document the need for this program. Congress can cure any error however, and the various reports commissioned after the *Adarand* decision demonstrates that intent. Thus, the Court finds that Congress had a compelling interest, which was supported by a strong basis in the evidence, when it reauthorized the program in 2003.

The Government relies in part on a Department of Justice summary of more than fifty documents and thirty congressional hearings on minority-owned businesses prepared in response to the Supreme Court's *Adarand* decision. This document, known as the Appendix, examines both anecdotal evidence and statistical evidence available to Congress. While Rothe argues that the Appendix is "statistically bankrupt," the Court finds that the evidence Congress used to support creating these types of programs is entitled to some deference. *Rothe III,* 262 F.3d at 1322, n. 4. In addition, the Court finds the reasoning in *Sherbrooke* more persuasive and accepts the Appendix as part of the valid evidence before Congress when it re-enacted this program. *Sherbrooke,* 345 F.3d at 970; *see also Adarand VII,* 228 F.3d at 1167–76.

The Appendix cites impediments to credit, training, and bonding. While the Federal Circuit reminded this Court that these impediments would be the same regardless of race, the Court notes that the Small Business Administration specifically considers these types of factors when considering whether a business is economically disadvantaged. *See* 13 C.F.R. § 124.104. Most small businesses just starting out may have "diminished capital and credit opportunities," but the program at issue was designed in part to encourage small businesses to compete in the arena of defense contracting. The Court must consider the evidence that minorities, more so than other small business concerns, but also like other small business

concerns, have a difficult time in achieving economic parity. Economic discrimination supports the assertion that a race based remedy is required. *Adarand VII*, 228 F.3d at 1170, n. 13. The program Rothe contends is unconstitutional takes race into consideration as only one factor. While small businesses are more likely economically disadvantaged, the fact that Congress considered evidence of economic disparity also supports this remedial program.

The Appendix also provides evidence that Congress was attempting to create a unified law to respond to the vestiges of discrimination. The "Supreme Court has ... suggested that the legislative body [may] make findings that pre-existing antidiscrimination provisions have been enforced but unsuccessful." *Rothe III*, 262 F.3d at 1331. In the Appendix, the Government demonstrated that although Title VII of the Civil Rights Act of 1964 was created to eliminate racism in employment, multiple cases arose against the major unions throughout the nation demonstrating that minorities were being denied access to skills.[12] Here, the business services industry is not exempt from its share of Title VII cases. Likewise, the regulations provide that when actual participation by disadvantaged businesses "exceeds the benchmark limitations established by the Department of Commerce, SBA, in its discretion, may decide not to accept an application for 8(a)" participation from a concern that could qualify in that same industry. 13 C.F.R. § 124.108(f). This demonstrates that Congress created a statistical framework

to ensure that the program only redressed present day discrimination in industries still suffering.

In 1998, the Department of Commerce published another report purporting to study government contracting opportunities in various industry groups.[13] *See* Benchmark Study, 63 Fed.Reg. 35714–01. In that report, Congress was made aware that SDB's in business services, the industry at issue in this case, had the ability to capture 40.2% of the contracting dollars in 1996, but were only awarded 26.4% of those dollars. Yet again, the goal for public contracting was a mere 5%. Thus, the pool of ready, willing, and able businesses outstripped the goal set for the Department of Defense by eight fold. Although this 40.2% does not establish a percentage of contractors capable of competing on this particular contract, the Court finds that this type of statistical evidence is more than ample to support Congress's finding that a discreet remedy encouraging 5% of Defense dollars to SDB's constitutional, particularly in light of Congress's belief that the Department of Defense was a passive participant in discrimination. Thus, while Rothe alleges that the Government cannot show "that racial discrimination was so pervasive that it is reasonable to assume that it affected all minority owned and controlled firms," this Court finds that this type of generalized statistical evidence documenting the wide disparity in public contracting dollars and SDB's shows pervasive discrimination affecting all minority groups. *Concrete Works of*

---

**12.** Congress recognized in 1987 and recognizes today, that *discrimination in employment creates a substantial hurdle for minorities obtaining skills needed to become entrepreneurs or contractors. See also Grutter,* 539 U.S. at 330, 123 S.Ct. 2325. ("These benefits [of diversity] are not theoretical, but real as major American businesses have made clear that the skills

needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas and viewpoints.").

**13.** Rothe contends that the Benchmark Study is flawed. Judge Prado previously denied Rothe's Motion to Strike this report and this Court will not reconsider that ruling.

*Colo., Inc. v. City and County of Denver, Colo.,* —— U.S. ——, 124 S.Ct. 556, 157 L.Ed.2d 449 (2003) (mem.) (Scalia, J. dissenting).

"[The Court] see[s] nothing impermissible about setting numerical goals at something less than absolute parity." *Engin'g Contractors Assoc. of S. Florida, Inc. v. Metropolitan Dade County,* 122 F.3d 895, 927 n. 6 (11th Cir.1997). The Benchmark Study found that minority owned businesses could capture 40.2% of the relevant market at issue, in this case business services. This study demonstrates that the pool of ready, willing, and able businesses outstripped the goal set for the Department of Defense by eight fold. While the Federal Circuit found unwarranted this Court's reliance on these numbers when determining the 1992 reauthorization, the Court finds them relevant and compelling when determining the 2003 reauthorization.

The five percent goal does not violate equal protections guarantees. This five percent goal cannot be considered a quota because there are no penalties involved if the Department of Defense does not meet the goal.[14] *Northern Contracting, Inc. v. The State of Ill.,* 2004 WL 422704, at \*28 n. 39 (N.D.Ill. Mar. 3, 2004). "Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" *Grutter,* 539 U.S. at 335, 123 S.Ct. 2325 *citing Croson,* 488 U.S. at 496, 109 S.Ct. 706. "In contrast, a permissible goal ... require[s] only a good faith effort ... to come within a 'range demarcated by the goal itself' ...." *Id. citing Sheet Metal Workers' v. E.E.O.C.,* 478 U.S. 421, 475, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). While Rothe argues that the use of the term "shall be" in

the Congressional hearings implies that the 5% is a mandate, the 5% figure was codified as a mere goal. Indeed, Rothe even cites Congressman Dickinson's statement that by setting a *high goal,* the program is likely to accomplish full economic participation by SDB's. *Id. citing* 132 Cong. Rec. 21,714–21 (1986) (emphasis added). *See also Statement of Hon. Bill Richardson, Representative from New Mexico, Hearing before Committee on Armed Services,* 102nd Cong., 1st Sess., 13 (1991), *reprinted in* 92 CIS H 20122. ("When Congress passed section 1207 4 years ago, it certainly expected more than a 1–percent improvement by 1990.... For this reason, I tried unsuccessfully to offer an Amendment to the 1992 Defense Authorization bill, as I have in past years, to establish a 5–percent mandate, not goal, for SDB's in both prime contract and subcontract awards.").

The Government also demonstrated that the price evaluation program efficiently and fairly helped it meet it's goal of 5%. The Government provided uncontroverted evidence that from 1995 until 1998, the Air Force had offered 43 contracts. All 43 contracts were subject to the SDB price evaluation program. The Government submitted that only 6 of those 43 contracts went to SDB's. Therefore, non-SDB entities were underbidding SDB entities, even with the PEA program, a majority of the time. This demonstrates that the PEA program created to further the constitutional goal of 5% participation was not overreaching.

Moreover, Congress directed the SDB program and the PEA program specifically at individuals affected by discrimination. The Government designed regulations to identify and eliminate individuals who

---

**14.** In fact, in 1998, Congress created a trigger mechanism that suspended all programs designed to facilitate meeting the 5% goal if the goal is met for the previous fiscal year. 10 U.S.C. § 2323(e)(3)(B). The program at issue has not been used since 1998.

were not disadvantaged and should no longer qualify. *Fullilove,* 448 U.S. at 487, 100 S.Ct. 2758. For example, an SDB can only participate in the program for a period of nine years. 13 C.F.R. § 124.2. In addition, the Small Business Administration has placed net worth caps on individuals participating in the program. 13 C.F.R. 124.104(c)(2). By placing a cap on individuals that can participate, the program targets individuals "whose ability to compete" is no longer impaired. 13 C.F.R. § 124.104. In addition, the presumption of social disability can be overcome with credible evidence. 13 C.F.R. § 124.103(c). Likewise, an interested party may protest the disadvantaged status of an apparently successful SDB. 13 C.F.R. § 124.1017. Thus, these waiver provisions further support the Court's conclusion that Congress specifically and narrowly tailored this remedy to its perceived compelling interest.

Rothe argues that even if the Court upholds the program as applied to other minority groups, there is no evidence demonstrating that Asian–Americans should be considered socially and economically disadvantaged. However, in 1996, the Department of Justice noticed "Proposed Reforms to Affirmative Action in Federal Procurement" and asked for comments. 61 F.R. 26,042–01. In that notice, the Department of Justice reported that "56% of black business owners . . . and 11% of Asian business owners ha[d] experienced known instances of discrimination in the form of higher quotes from suppliers." 61 F.R. 26,061. While this statistical evidence demonstrates private discrimination, it also supports the Government's interest in not funding private discrimination with taxpayer's dollars.

In addition, The Urban Institute, at the request of the Justice Department, analyzed 59 statistical studies completed by state and local governments in response to *Croson.* The Urban Institute report concluded, in part, that "minority owned businesses receive on average only 59 cents of state and local expenditures that those firms would be expected to receive, based on their availability. The median disparities vary from 39 cents on the dollar for firms owned by Native Americans to 60 cents on the dollar for firms owned by Asian–Americans." *Id.* at 26,061–62. The Department of Justice concluded that all minority firms, including Asian–Americans, were underutilized by state and local governments because of discriminatory practices at that level. *Compare Kimel,* 528 U.S. at 89, 120 S.Ct. 631 (where "Congress never identified any pattern of age discrimination by the states."). This information is precisely the information Congress needed to continue the program as it relates to Asian–Americans. Because the Federal Circuit commanded this Court to "draw the line" in the first instance, the Court holds that 59 statistical studies from across the nation succinctly demonstrates that Congress was reacting with a strong basis in the evidence. These 59 studies, summarized by this Department of Justice notice, present enough statistical disparity to conclusively demonstrate that Asian–Americans, as well as other minorities, were not competing at a national level because of discrimination.

Rothe argues that the owners of ICT, the SDB in this contract challenge, were not economically disadvantaged. In support of this argument, Rothe submitted pictures of the owners' home and other personal financial information. Such information might have been relevant had Rothe chose to administratively challenge ICT's SDB designation, but the personal fortunes of the owners of ICT do not lend support to the general contention that Asian–Americans are not discriminated against. Indeed, Rothe does not seem to dispute that Asian–Americans experience discrimination in this day and age. Rothe

instead argues that "[i]t is wrong to lump all Asian Pacific–Americans, especially Korean, Japanese, Chinese and sub-continent Indians, for example, all of whom compete equally with 'white' Americans in with groups that may truly be socially and economically disadvantaged as a result of discriminatory conduct." However, as previously discussed, arguing that a particular sub-class should not be presumed socially and economically disadvantaged narrows the inquiry too much for Congress. *See also Adarand VII,* 228 F.3d at 1176 n. 18 ("If Congress has valid evidence for example that Asian American individuals are subject to discrimination because of their status as Asian Americans, it makes no sense to require sub-findings that subcategories of that class experience particularized discrimination ...."). If Rothe believes that the owners of ICT did not qualify as an SDB, Rothe had administrative remedies available to it.[15] Thus, the Government documented its strong basis in evidence to find that the 5% goal should be applied to Asian–Americans and that the PEA program helped further that goal and was necessary for this particular industry.

### Conclusion

Rothe's only remaining remedy for its as-applied challenge concerning the 1998 contract disposition is declaratory relief. In 1992, Congress did not statistically document the need for this race-based remedial program. Therefore, the Court GRANTS, in part, Rothe's Motion for Summary Judgment and DENIES, in part, the Government's Motion.

Rothe's facial challenge to the 2003 program seeks prospective declaratory and injunctive relief. The Government demonstrated that Congress relied, in part, on statistical evidence for the 2003 reauthorization. Because this statistical evidence, when coupled with Congress' long documentary history of anecdotal and private discrimination, meets the strong basis in the evidence test, it was Rothe's burden to establish that no set of circumstances exists under which the 5% goal and PEA program could be constitutional. Rothe did not meet that ultimate burden. Thus, the Court GRANTS, in part, the Government's Motion for Summary Judgment, and DENIES, in part, Rothe's Motion. Because the position of the United States was substantially justified in this action, each side shall bear their own costs. 28 U.S.C. § 2412(d)(1)(A). This case is DISMISSED.

---

**15.** The Court notes that the owners of ICT sold the business sometime during this lawsuit. The Court is unaware if ICT still qualifies as a business owned and controlled by a socially and economically disadvantaged individual.